# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                    )

**PALOMAR TECHNOLOGIES, INC.,**    )

                **Plaintiff,**          )

                                   )    **Civil Action No.**

         **v.**                    )    **18-10236-FDS**

                                   )

**MRSI SYSTEMS, LLC,**         )

                **Defendant.**     )
_____)

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

**SAYLOR, J.**

This is a patent infringement dispute between two companies involved in the production and distribution of "die attach" systems. Plaintiff Palomar Technologies, Inc. has brought suit against defendant MRSI Systems, LLC. The complaint asserts a claim for patent infringement pursuant to 35 U.S.C. § 271.[1]

Palomar is the owner and assignee of U.S. Patent No. 6,776,327 ("the '327 patent"), entitled "High-Accuracy Placement Method Using Double Pick and Place." The case is now at the claim-construction phase.

The parties have submitted proposals for the construction of 14 terms: (1) "first workpiece," (2) "second workpiece," (3) "origination location," (4) "target intermediate location," (5) "intermediate error deviation," (6) "target attach location," (7) "actual attach location," (8) "attach error deviation," (9) "displace," (10) "place," (11) "pick," (12) "displace said first workpiece from said actual intermediate location," (13) "performing a first place step to

---

[1] The complaint also asserts claims for induced patent infringement and contributory infringement.

displace," (14) "performing a second place step to displace."

## I. Background

### A. Palomar Technologies

Palomar Technologies, Inc., provides, among other things, "die-attach solutions" and "precision assembly services." (Compl. ¶ 2). Palomar's systems are used to manufacture "LED, optoelectronic, solar, RF and microelectronic packages in the photonic, wireless, microwave, automotive, aerospace, defense, medical and life science industries." (*Id.*).

### B. The '327 Patent

The '327 patent generally relates to a "method for high accuracy placement of a first workpiece onto a second workpiece for attachment of the two workpieces." (*Id.* col. 1 ll. 7-9). More particularly, the patent relates to a "high accuracy [automated] placement method which utilizes double pick and place of the first workpiece to enhance the final placement accuracy of the first workpiece onto the second workpiece." (*Id.* col. 1 ll. 9-13).

According to the patent, in the production of many electronic applications, dies, or tiny semiconductor devices, are attached to circuit bodies. ('327 patent col. 1 ll. 16-24). The process of attaching a die to a circuit body typically involves two steps: first, in the "pick and place" operation, "the die is picked from a remote location by a tool and placed on the circuit body at the location where attachment is desired." ('327 patent col. 1 ll. 25-28). Next, "the die and circuit body are heated to the melting point of an interposed solder, more specifically termed the die attach material, to form an electrically and thermally conductive die attach connection between the die and the circuit body." ('327 patent col. 1 ll. 28-32).

According to the patent, automated die-attach techniques were already known and used, although the conventional techniques were not able to perform pick and place operations in a

2

manner sufficiently accurate for emerging industries, such as the optical communications industry. (*Id.* col. 1 ll. 33-35, 42-45). The '327 patent distinguishes itself from these earlier techniques by claiming to provide an automated placement method that is "both time efficient and highly accurate." (*Id.* col. 1 ll. 49-51).

The patent's automated placement method involves two steps. Initially, the "first workpiece, which is preferably a die," is "positioned at the origination location." (*Id.* col. 1 ll. 63-64; *Id.* col. 2 ll. 8). During the "first place step," the first workpiece is "displace[d] . . . from the origination location to an intermediate location different from the origination and attach locations." (*Id.* col. 1 ll. 66-67; *Id.* col. 2 ll. 1-2). Then, during the "second place step," the first workpiece is "displace[d] . . . from the intermediate location to the attach location and the first workpiece is attached to the second workpiece at the attach location." (*Id.* col. 2 ll. 2-5).

The patent states that the error rate between the "actual" and "target" "intermediate location" is "preferably between 0 and 5 degrees with respect to a rotational reference axis or between about 0 and 15 microns with respect to linear reference axes." (*Id.* col. 2 ll. 30-34). The patent also states that the error rate between the "actual" and "target" attach location is "preferably between about 0 and 2 degrees with respect to a rotational reference axis or between about 0 and 10 microns with respect to linear reference axes." (*Id.* col. 2 ll. 50-54).

### C.     MRSI Systems, LLC

MRSI Systems, LLC designs, manufactures, and supplies "fully automated, ultra-high precision die-attach and epoxy dispensing tools," including the "MRSI-M3 Assembly Work Cell." (Compl. ¶ 12).

The MRSI-M3 Assembly Work Cell is "an automated die bonder" that "utilizes" a technique called the "double-pick and place." (*Id.* ¶ 13). Under this technique, a "pick tool"

picks a die from a "waffle pack, Gel-Pak, wafer, or tape and reel," moves the die to "an intermediate location," and places the die "onto a vacuum containing surface." (*Id.*). After the pick tool disengages the die, and the system "utilizes pattern recognition to obtain the coordinates of the die," the pick tool reengages the die and moves the die to a location on a circuit body. (*Id.*). This method, Palomar contends, infringes on its '327 patent. (*Id.* ¶ 15).

D.    **Representative Claims**

Representative claims of the '327 patent are as follows:

Claim 1:

A method for placement of a **first workpiece** onto a **second workpiece** comprising the steps of:

a) providing a **first workpiece** positioned at an **origination location** different from a **target intermediate location**;

b) providing a **second workpiece** positioned at a work location and having a **target attach location** different from said **target intermediate location** and said **origination location**;

c) **performing a first place step to displace** said **first workpiece** from said **origination location** to an actual intermediate location, wherein said actual intermediate location is different from said **origination location** and is identical to said **target intermediate location** or differs from said **target intermediate location** by an **intermediate error deviation**; and

d) **performing a second place step to displace said first workpiece from said actual intermediate location** to an **actual attach location** on said **second workpiece**, wherein said **actual attach location** is different from said **origination location** and said **target intermediate location** and is identical to said **target attach location** or differs from said **target attach location** by an **attach error deviation**.

'327 patent col. 13 ll. 14-37 (emphasis added).

Claim 2:

The method of claim 1 further comprising attaching said **first workpiece** to said **actual attach location**.

4

'327 patent col. 13 ll. 38-39 (emphasis added).

Claim 3:

The method of claim 1 wherein said **first workpiece** is displaced from said actual intermediate location to said **actual attach location** with reference to a second **place** path determined by referencing said **target attach location**.

'327 patent col. 13 ll. 40-43 (emphasis added).

Claim 4:

The method of claim 1 wherein said **first workpiece** is displaced from said **origination location** to said actual intermediate location with reference to a first **place** path determined by referencing said **target intermediate location**.

'327 patent col. 13 ll. 44-47 (emphasis added).

Claim 5:

The method of claim 1 further comprising performing a first **pick** step, in advance of said first **place** step wherein a pickup tool engages said **first workpiece** at said **origination location**.

'327 patent col. 13 ll. 48-51 (emphasis added).

Claim 6:

The method of claim 5 wherein said **first workpiece** is displaced in said first **place** step by displacement of said pickup tool engaging said **first workpiece**.

'327 patent col. 13 ll. 52-54 (emphasis added).

Claim 7:

The method of claim 5 further comprising disengaging said pickup tool from said **first workpiece** at said actual intermediate location.

'327 patent col. 13 ll. 55-57 (emphasis added).

Claim 8:

The method of claim 1 further comprising performing a second **pick** step, in advance of said second **place** step wherein a pickup tool engages said **first workpiece** at said actual intermediate location.

'327 patent col. 13 ll. 58-61 (emphasis added).

Claim 9:

The method of claim 8 wherein said **first workpiece** is displaced in said second **place** step by displacement of said pickup tool engaging said **first workpiece**.

'327 patent col. 13 ll. 62-64 (emphasis added).

Claim 17:

The placement method of claim 1 wherein said **first workpiece** is a die.

'327 patent col. 14 ll. 24-25 (emphasis added).

Claim 18:

The placement method of claim 1 wherein said **second workpiece** is a circuit body.

'327 patent col. 14 ll. 26-27 (emphasis added).

Claim 24:

A method for placement of a **first workpiece** onto a **second workpiece** comprising the steps of:

a) providing a **first workpiece** positioned at an **origination location** different from a **target intermediate location**;

b) providing a **second workpiece** having a target attach location different from said **origination location**;

c) **performing a first place step to displace** said **first workpiece** from said **origination location** to an actual intermediate location, wherein said actual intermediate location is identical to said **target intermediate location** or differs from said **target intermediate location** by an **intermediate error deviation**; and

d) **performing a second place step to displace said first workpiece from said actual intermediate location** to an **actual attach location**, wherein said **actual attach location** is identical to said target attach location or differs from said target attach location by an **attach error deviation**.

'327 patent col. 15 ll. 41-59 (emphasis added).

## II.    Legal Standard

The construction of claim terms is a question of law, which may in some cases rely on underlying factual determinations. *Teva Pharm. USA, Inc. v. Sandoz, Inc.¸* 135 S. Ct. 831, 835, 837–38 (2015); *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning. The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application." *Id.* at 1313. Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### A.    The Words of the Claim

The claim construction analysis normally begins with the claims themselves.[2] The

---

[2] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive. The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321. Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly

claims of a patent "'define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, it is the arrangement of the disputed term in the claims that is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314. For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another. *Id.* In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

### B.       The Specification

"The claims, of course, do not stand alone." *Id*. "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citations and quotations omitted). For that reason, the specification must always be consulted to determine a claim's intended meaning. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576,

---

understood words." *Id.* at 1314.

1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315–17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Id.* at 1323. A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect."). "In particular, [the Federal Circuit] ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being

limited to that embodiment." *Phillips*, 415 F.3d at 1323. This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

## C. The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*,

536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378–79 (Fed. Cir. 2005)).

D.  **Extrinsic Sources**

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319. However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance. *Id.* at 1318–19.  Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion. *Id.* at 1319.

III.  **Analysis**

There are 14 terms at issue in the patents:

| Term | Plaintiff's construction | Defendant's construction | Claims |
|---|---|---|---|
| "First workpiece" | "An electronic component that is placed onto a second workpiece: by way of example only, a semiconductor die, a laser diode, a capacitor, or a transistor" | "A displaceable object that is being worked on" | 1-10, 14-17, 19, 20, 22-24 |
| "Second workpiece" | "A second electronic component upon which the first workpiece is placed and attached: by way of example only, a circuit body, which is | Plain and ordinary meaning | 1, 14, 18, 19, 22, 24 |

| | any structure to which a die is conventionally attached for purposes of assembling a circuit" | | |
|---|---|---|---|
| "Origination location" | "The location of the first workpiece at the beginning of the pick and place alignment procedure" | "Arbitrary location, where the first workpiece originates, different from the target intermediate location, target attach location, and work location" | 1, 4, 5, 19, 21, 22, 24 |
| "Target intermediate location" | "The desired intermediate location for placing the first workpiece" | "Predetermined location, different from the origination location, upon which the first place path is based" | 1, 4, 19, 22, 24 |
| "Intermediate error deviation" | "The difference between the target intermediate location and the actual intermediate location" | "A calculated error deviation between an actual intermediate location and a target intermediate location OR indefinite" | 1, 12, 13, 19, 22, 24 |
| "Target attach location" | "The desired location for placing and attaching the first workpiece on to the second workpiece" | "Predetermined location on the second workpiece where the first workpiece is to be attached" | 1, 3, 19, 22, 24 |
| "Actual attach location" | "The location on the second workpiece where the first workpiece is actually placed" | "Calculated location on the second workpiece where the first workpiece is physically attached" | 1, 2, 3, 14, 19, 20, 22, 23, 24 |
| "Attach error deviation" | "The difference between the target attach location and the actual attach location" | Indefinite | 1, 11, 13, 19, 22, 24 |
| "Displace" | "To pick a workpiece and to move it from one location to place it at another location" | "To move physically from one location to another without placing" | 1, 3, 4, 6, 9, 10, 19, 22, 24 |
| "Place" | "Putting the first workpiece on a location which covers releasing it from the pickup tool" | "To put in a position" | 1, 3, 4, 5, 6, 8, 9, 10, 15, 19, 22, 24 |
| "Pick" | "Engaging a workpiece with a pickup tool to | "Lift up" | 5, 8 |

| | displace the workpiece from a location" | | |
|---|---|---|---|
| "Displace said first workpiece from said actual intermediate location" | "To pick the first workpiece from the actual intermediate location and move it to a different location" | "Displace the first workpiece from the exact same location that first workpiece was displaced to in the first place step" | 1, 24 |
| "Performing a first place step to displace" | "Picking a first workpiece from its original location and moving and placing it on the actual intermediate location" | "Determining a path between the origination location and the target intermediate location, and moving physically" | 1, 24 |
| "Performing a second place step to displace" | "Picking the first workpiece from its position at the actual intermediate location and moving it and placing it on the actual attach location" | "Calculating a path between the actual intermediate location and the actual attach location and correcting for the intermediate error deviation from the first place step" | 1, 24 |

### A.     "First Workpiece"

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| "First workpiece" | "An electronic component that is placed onto a second workpiece: by way of example only, a semiconductor die, a laser diode, a capacitor, or a transistor" | "A displaceable object that is being worked on" |

The first dispute concerns the term "first workpiece."  Both parties have suggested constructions that violate the basic principles of *Phillips*, either by relying on dictionary definitions or importing limitations into the claims.

Defendant purportedly contends that "first workpiece" should be given its plain and ordinary meaning, "limit[ed]" by the "specification and claims."  (Doc. 143 at 8)  But it further contends that "[i]t is well known that dictionary definitions establish plain and ordinary

meaning." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Therefore, defendant suggests, the construction of "first workpiece" should begin with the dictionary definition of workpiece—"an object being worked on with a tool or machine." That methodology—that is, looking first to the dictionary definition of a term—was specifically rejected in *Phillips*. 415 F.3d at 1320 (Fed. Cir. 2005).

Plaintiff, in turn, contends that the term "workpiece" should include the limitation that it be an "electronic component." But that, too, is problematic. The claims generally do not contain the word "electronic," or anything similar, although the specification discusses electronic components at length.[3] Essentially, plaintiff is seeking "to incorporate . . . limitations from the specification," a practice the Federal Circuit has described as "one of the cardinal sins of patent law." *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001).

Plaintiff also seeks to import examples from the preferred embodiment into the definitions of the claims. For example, the specification provides: "The displaceable workpieces 12, 14, 16 each are preferably more particularly characterized as a die. A die is typically a tiny semiconductor device, for example, a diode (such as a laser diode), a capacitor, or a transistor." ('327 patent col. 5 ll. 21-23). Plaintiff proposes that examples be given, including a semiconductor die, laser diode, capacitor, or transistor. But adding those examples would not greatly elucidate the claim, and is likely to confuse the jury by appearing to narrow the scope of the claim.

A further issue concerns whether the workpiece should be described as a "component"

_____

[3] There are two claims that refer to electronic components. Dependent claim 17 claims "[t]he placement method of claim 1 wherein said first workpiece is a die," and dependent claim 18 claims "[t]he placement method of claim 1 wherein second workpiece is a circuit body."

(as plaintiff suggests) or an "object" (as defendant suggests). The term "workpiece" as used in the claims plainly refers to a component that is attached to another to compose an assembly. It is not simply an object upon which work is performed. Accordingly, the Court will construe the term "workpiece" to mean a "component."

The parties also offer different descriptions of what is done *to* the first workpiece; plaintiff describes the first workpiece as being "placed onto" a second workpiece, while defendant describes the first workpiece as "being worked on." Because the plaintiff's description more accurately reflects the claims—particularly independent Claims 1 and 24, which provide "a method for placement of a first workpiece onto a second workpiece"—the Court will adopt its proposed description of what is done to the first workpiece.

Accordingly, the term "first workpiece" will be construed to mean "a component that is to be placed onto a second workpiece."

**B.**     **"Second Workpiece"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Second workpiece" | "A second electronic component upon which the first workpiece is placed and attached: by way of example only, a circuit body, which is any structure to which a die is conventionally attached for purposes of assembling a circuit" | Plain and ordinary meaning |

The Court's construction for the term "second workpiece" will mirror its construction for "first workpiece." Accordingly, the term "second workpiece" will be construed to mean "a second component upon which the first workpiece is placed."

## C. "Origination Location"

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Origination location" | "The location of the first workpiece at the beginning of the pick and place alignment procedure" | "Arbitrary location, where the first workpiece originates, different from the target intermediate location, target attach location, and work location" |

The parties agree that the "origination location" is the initial location of the first workpiece. The parties disagree, however, as to whether the construction should include additional modifiers.

Plaintiff's construction includes "the pick and place alignment procedure," a phrase that does not appear in either the claims or the specification. It is unclear what those additional words add by way of clarity, and they appear to import limitations into the claims.

Defendant proposes construing "origination location" to mean an "arbitrary" location. Defendant takes that language from the specification, which in relevant part references the "displacement of" a "displaceable workpiece from an *arbitrary origination location* to a substantially fixed and known intermediate location." ('327 patent col. 12 ll. 51-53) (emphasis added). At other points, however, the specification refers to the origination location as being "distinct" and "usually the result of . . . specific carrier configuration[s]." ('327 patent col. 4 ll. 49-51; '327 patent col. 4 ll. 63). Adding "arbitrary," therefore, would not accurately reflect the specification, taken as a whole. Furthermore, it might prove confusing to jurors, as it suggests that the origination location is random or unintentional, rather than deliberate.

Again, a much simpler and more straightforward construction will be adopted by the Court. A sequence of physical movements has to begin somewhere; in the '327 patent, that is the "origination location." Accordingly, the term "origination location" will be construed to mean "the location of the first workpiece at the beginning of the procedure."

### D. "Target Intermediate Location"

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Target intermediate location" | "The desired intermediate location for placing the first workpiece" | "Predetermined location, different from the origination location, upon which the first place path is based" |

The parties' proposed constructions of "target intermediate location" describe different roles the location plays in the patent's method. Plaintiff's construction describes the "target intermediate location" as the location where the first workpiece is to be placed during the first place step, while defendant contends that it serves as the location upon which the "first place path is based."

Defendant's construction appears to arise out of Claim 4, which claims "[t]he method of Claim 1 wherein said first workpiece is displaced from said origination location to said actual intermediate location with reference to a first place path determined by referencing said target intermediate location." ('328 patent col. 13 ll. 44-47). According to defendant, therefore, the target intermediate location is the location "upon which the first place path is based." According to the specification, however, the first place path appears to be based upon both the target intermediate location *and* the origination location: "[t]he reference coordinates of the origination location [] and the target intermediate location [] are used to determine a first place path . . . ." ('327 patent col. 7 ll. 23-25).

Plaintiff contends that such an approach would violate the doctrine of claim differentiation. Under that doctrine, "a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Phillips* 415 F.3d at 1315. Thus, plaintiff contends that because Claim 4 depends from Claim 1, and only Claim 4 includes the limitation of "a first place path," claim differentiation suggests that "target intermediate location" should not be read as including "a first place path" in Claim 1. By

incorporating the limitation of Claim 4, therefore, the proposed construction violates the claim differentiation doctrine.

The Court agrees that the doctrine of claim differentiation clearly counsels against reading target intermediate location to include "a first place path." Furthermore, and in any event, it does not appear that any construction is actually necessary.

The key word in the term is "target." Plaintiff uses the term "desired" location, and defendant uses the term "predetermined" to describe the target location. Neither term is used in either the claims or the specification. And both concepts are inherent in the ordinary word "target." A "target" location is both a "desired" location (for example, an archer desires that the arrow hit the target) and a "predetermined" location (the archer aims at a particular spot; he does not determine the target after the arrow is shot). And an "intermediate" location is obviously neither the "original" location nor the "final" location.

Accordingly, the term "target intermediate location" will be given its plain and ordinary meaning.

### E.    "Target Attach Location"

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Target attach location" | "The desired location for placing and attaching the first workpiece on to the second workpiece" | "Predetermined location on the second workpiece where the first workpiece is to be attached" |

The parties' proposed constructions for the term "target attach location" appear to have two principal differences.

First, the parties again disagree as to whether the location should be described as "desired" or "predetermined." Again, the Court will not define the term "target" further.

The parties further disagree whether the first workpiece is to be "placed and attached" at the target attach location, or simply "attached." Plaintiff refers to the actual attach location as

where the first workpiece is both *placed and attached*, while defendant states only that the first workpiece is *attached* at the location. Defendant's proposal is more straightforward. For one thing, the act of "attaching" implicitly covers the act of "placing"—that is, it seems impossible to attach a workpiece at a location without having also placed it at the location. Adding the word "placed," therefore, is unnecessary.

In addition, and more importantly, the claims themselves refer to the location only as the spot of "attaching." For example, Claim 2 expands on Claim 1 by referring to it as "further comprising attaching said first workpiece to said actual attach location," while Claim 14 expands on Claim 2 by describing its "placement method" as the location where "said first workpiece is thermally attached to said actual attach location . . . ." ('327 patent col. 13 ll. 38-39; '327 patent col. 14 ll. 11-12). By contrast, the claims themselves do not use the word "placing" or "placed" to describe the activity at the actual attach location.

Accordingly, the term "target attach location" will be given its plain and ordinary meaning.

F. **"Actual Attach Location"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Actual attach location" | "The location on the second workpiece where the first workpiece is actually placed and attached" | "Calculated location on the second workpiece where the first workpiece is physically attached" |

The parties' proposed constructions of "actual attach location" have three principal differences.

First, defendant refers to the location on the second workpiece as "calculated," while plaintiff does not. A calculation necessarily requires some sort of mathematical or analytical step. Because neither the words of the claims nor the specification refer to the actual attach

location as a "calculated" location, adding the word "calculated" imports a limitation that is unnecessary and not stated or suggested by the claims.

Second, defendant refers to the first workpiece as being *physically* attached, while plaintiff simply states that the piece is attached. Again, because neither the claims nor the specification uses the word "physically"—and because it is unclear what other type of attachment, if not physical, is possible—adding the term "physically" is unnecessary and potentially confusing to the jury.

Third, plaintiff refers to the actual attach location as the location where the first workpiece is both placed and attached. Again, the word "attach," in this context, does not require further explanation.

Accordingly, the term "actual attach location" will be construed to mean "the location on the second workpiece where the first workpiece is actually attached."

### G. "Intermediate Error Deviation"

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Intermediate error deviation" | "The difference between the target intermediate location and the actual intermediate location" | "A calculated error deviation between an actual intermediate location and a target intermediate location" OR indefinite |

### H. "Attach Error Deviation"

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Attach error deviation" | "The difference between the target attach location and the actual attach location" | Indefinite |

Defendant contends that the terms "intermediate error deviation" and "attach error deviation" are indefinite for two reasons.

First, defendant contends that the "metes and bounds" of any error deviation "cannot be interpreted." Defendant's contention appears to rest on the premise that it is physically

impossible for the actual location to be "identical" to the target location—in other words, that it is impossible for the error deviation to be zero. As support for that contention, defendant relies on a statement of its expert, Dr. Samir Nayfeh, that a person of ordinary skill in the art would "recognize" that the error deviation could not be zero.

At the outset, the Court is unsure as to why the error deviation—if understood to mean the difference in distance between the target location and the actual location—could not, at least theoretically, be zero. Defendant's complaint appears to be that if the deviation is zero, it cannot be an error. In any event, even if defendant is correct that the error deviation could only be "very small," and not "identically zero," the claims in question here, "viewed in light of the specification," remain "precise enough to afford clear notice of what is claimed." The Patent Act, although it "mandates clarity," "recogniz[es] that absolute precision is unattainable." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-10 (2014).

Next, defendant takes two dictionary definitions of "error" ("the difference between an observed and calculated value and a true value") and "deviation" (a synonym of "variation") and contends that the combined definition, or "the difference in variation," could not be what was "intended" by the '327 patent. (Defendant's Opening *Markman* Brief, Docket No. 143 at 7). Thus, defendant appears to allege, plaintiff must have used "error and deviation together in a manner contrary to known meaning," and effectively "act[ed]" as its "own lexicographer," a practice that defendant contends requires a patentee to follow "very strict rules." (Defendant's Reply *Markman* Brief, Docket No. 153 at 5).

In support of that contention, defendant cites to *Medicines Co. v. Mylan, Inc.*, 854 F.3d 1296, 1306 (Fed. Cir. 2017). In *Medicines*, the Federal Circuit held that a patentee was barred from acting "as its own lexicographer" because it had failed to "clear[ly] express[] [its] intent" to

do so in the patent's specification. The court's decision in *Medicines*, however, relied upon the fact that the patentee, in defining all of the patent's terms, had "used a similar format" of placing "the defined term in quotation marks, followed by the terms 'refers to' or 'as defined herein.'" *Id.* (internal citation removed). Because the patentee "depart[ed] from this format" in writing the statement in question, the court concluded that the statement could not have been one where the patentee had intended to act as its own lexicographer. *Id.*

The specification here, by contrast, does not contain anything similar. Indeed, in construing "attach error deviation," plaintiff points to the portion of its specification that defines the "attach error deviation" in the same manner as the specification explains all of the patent's terms. The relevant portion of the specification states: "[t]he attach error deviation . . . is expressed . . . as the linear distance between the center of an actual attach location and the target attach location [] in the x-y plane . . . or alternatively . . . as the difference between the angular orientation of the actual attach location and the angular orientation of the target attach location." ('327 patent col. 8 ll. 46-57).

Under the circumstances, the Court concludes that the patent does not provide "the clear expression of intent necessary for [plaintiff] to act as its own lexicographer." *Medicines*, 853 F.3d at 1306. It will therefore apply ordinary construction principles to construe the meaning of the disputed term.

As to "intermediate error deviation," defendant further contends that the term should be construed as "a calculated error deviation between an actual intermediate location and a target intermediate location." The parties' proposals apparently only differ as to whether to define the deviation as "a difference," as plaintiff does, or as a "calculated error deviation," as defendant does.

Plaintiff's proposed construction more accurately follows the language of the claims and the specification. In relevant part, Claim 1 provides that the "actual intermediate location . . . differs from [the] target intermediate location by an intermediate error deviation." ('327 patent col. 13 ll. 25-29). Again, the specification provides that the intermediate error deviation may be expressed either as a difference in "linear distance" or "angular orientation." ('327 patent col. 7 ll. 52-61). It does not contain the word "calculated." Moreover, any such difference (or "error deviation") exists no matter how it is expressed, and indeed it exists before it is calculated. The term "calculated" therefore improperly limits the claims, and may well prove confusing to the jury. And while the term "error deviation" is no doubt inelegant, read in context of the claims it clearly refers to a difference between the target location and the actual location—that is, the magnitude of the error.

Accordingly, the Court will construe the term "intermediate error deviation" to mean "the difference between the target intermediate location and the actual intermediate location." It will construe the term "attach error deviation" to mean "the difference between the target attach location and the actual attach location."

I.     **"Displace"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Displace" | "To pick a workpiece and to move it from one location to place it at another location" | "To move physically from one location to another without placing" |

The parties disagree whether the term "displace" should be construed to include the act of "placing." In order to understand the dispute, a review of the use of the terms "place" and "displace" in the claims is necessary.

First, the claims do not use the word "*place*" (or "placed") as a verb. The word "place" appears in four contexts, all as an adjective: "first place step," "second place step," "first place

23

path," and "second place path."  Both Claims 1 and 24, the only independent claims, use the

terms "first place step" and "second place step."[4]  The meaning of "place" as an adjective in

those terms will be addressed separately below.

Second, the term *"placement"* also appears in Claims 1 and 24.  ("A method for

placement of a first workpiece onto a second workpiece . . .").  Again, those two are the only

independent claims.[5]  The word "placement" thus appears in every claim.

Third, the patent uses the word *"displace"* (or "displaced") as a verb to describe the

movement of the first workpiece from the original location to the intermediate location, and then

to the attach location.  Thus, for example, Claims 1 and 24 read in part as follows:

> . . . performing a first place step to *displace* said first workpiece *from* said
> origination location *to* an actual intermediate location . . .

(emphasis added).  In each instance, the patent follows the word "displace" with a phrase

beginning with "from," followed by a phrase beginning with "to."

In substance, defendant contends that because the term "displace" means to remove

something, it cannot include the term "place," which is its antonym.  In an abstract sense, that is

correct.  As a practical matter, however, in the physical world, nothing can be displaced without

placing it somewhere else, even if that new location is only temporary.  To "displace" something

thus carries with it an implicit meaning:  if an object is "displaced," it is necessarily "placed"

somewhere else.  That is particularly true here, where the language of the patent states that a

workpiece is being displaced "from" one location "to" another location.

---

[4] In describing the "first place step," the specification provides that "the workpiece [] is *displaced* from the origination location to an actual intermediate location [] and *placed* on the actual intermediate location []." ('327 patent col. 7 ll. 43-47) (emphasis added).  The same language is used in the specification's description of the "second place step."  (*see* '327 patent col. 8 ll. 34-39: "the workpiece [] is displaced from the actual intermediate location [] to an actual attach location and placed on the actual attach location.").

[5] The term "placement" also appears in separately in dependent claims 14, 15, 16, 17, and 18, and the term "displacement" appears in dependent claims 6 and 9.

Furthermore, as noted, every independent claim begins with the phrase "a method for placement." That clearly suggests that the purpose of the invention is to "place" a workpiece, not simply to displace it. And the terms "first place step" and "second place step" describe the two basic steps of the method, which again involves "placing" a workpiece.

Thus, where the patent refers to "displac[ing]" a workpiece "from" one location "to" another, it is readily obvious what is meant: moving it from one location to another. While it perhaps would be clearer if the patent referred to "displacing" an object and "placing" it somewhere else, perfect clarity is not necessary. The words of a patent need not be absolutely precise, as long as they are clear. *See Nautilus*, 572 U.S. at 909-10. That standard is easily satisfied here.

Under the circumstances, the meaning of the term "displace" is "readily apparent." *Phillips*, 415 F.3d at 1314. The term "displace" will therefore be construed to mean "move from one location to another."

**J. "Place"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Place" | "Putting the first workpiece on a location which covers releasing it from the pickup tool" | "To put in position" |

As noted, the claims use the term "place" (as opposed to "placement" or "displace") only as an adjective. In each instance, where the word is used, it is either (1) part of the phrases "first place step" or "second place step" or (2) part of the phrases "first place path" or "second place path." In the first instance, the word "place" modifies the word "step": that is, it describes a type of step, either where the workpiece is moved from the original location to the intermediate location (the "first place step") or from the intermediate location to the attach location (the "second place step"). That phraseology is in both independent claims (Claims 1 and 24) as well

as various dependent claims (Claims 5, 6, 8, 9, 10, 15, 19, and 22).[6]  In the second instance, the

word "place" modifies "path":  that is, it describes a type of path, either the path along which the

workpiece moves from the original location to the intermediate location (the "first place path"),

or the intermediate location to the attach location (the "second place path").  That phraseology is

in Claims 3 and 4.

Plaintiff's proposed construction of "place" includes the acts of "putting" the workpiece

on a location, and "releasing" the workpiece from the pickup tool.  By contrast, defendant's

proposed construction includes only one act—"putting" something, such as a workpiece, "in

position."

Neither proposed construction reflects the actual usage of the term "place" in the claims

themselves.  Again, whatever the term "place" might mean in other contexts, here it is simply an

adjective modifying "step" or "path."  In context, it is part of a title:  the title of a particular step.

It might perhaps be clearer if the word "placement" were used instead; arguably, it might be

clearer yet if the word were omitted altogether.  In any event, the Court will give the term its

plain and ordinary meaning.

### K.      "Pick"

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Pick" | "Engaging a workpiece with a pickup tool to displace the workpiece from a location" | "Lift up" |

The term "pick" appears in Claims 5 and 8.  In both instances, it is used as an adjective to

modify the word "step."  Claim 5 is illustrative:

> The method of Claim 1 further comprising performing a first pick step, in advance
> of said first place step wherein a pickup tool engages said first workpiece at said
> origination location.

---

[6] Dependent claims 5 and 8 also add a "first pick step" and "second pick step," respectively.

'327 patent col. 13 ll. 48-51.

Defendant proposes that the term "pick" should be construed to mean "lift up." That would appear to require some vertical movement, and would appear to preclude, among other things, an entirely horizontal movement. It is not at all clear from where defendant takes the word "lift." In support of its contention, defendant provides various examples in the patent's claims, specification, and prosecution history where plaintiff or its representatives have used the word "pick" or the words "pick up." But nowhere do the words "lift up" appear to be used in describing the term "pick."

Plaintiff proposes that "pick" be construed to mean "engaging a workpiece with a pickup tool to displace the workpiece from a location." That construction more accurately reflects the words of the claims. That construction also better reflects the specification's description of the "first" and "second" pick "steps," which are described as being "performed by engaging the displaceable workpiece with a conventional pickup tool . . ." and being "performed by reengaging the pickup tool with the workpiece . . ." respectively. ('327 patent col. 7 ll. 29-30; '327 patent col. 8 ll. 31-32).

Plaintiff's proposed construction, however, includes the phrase "to displace the workpiece from a location." Because that description is not present in either the relevant claims, nor the relevant portions of the specification, it appears unnecessary, and only likely to cause confusion.

Accordingly, the Court will construe the term "pick" to mean "using a pickup tool to engage a workpiece."

### L.  "Displace Said First Workpiece From Said Actual Intermediate Location"

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| "Displace said first workpiece from said actual intermediate location" | "To pick the first workpiece from the actual intermediate location and move it to a different location" | "Displace the first workpiece from the exact same location that first workpiece was displaced to in the first place step" |

The construction of the phrase "displace said first workpiece from said actual intermediate location" has two components.

First, the parties again disagree as to the meaning of the word "displace." The parties propose different verbs to describe the act of "displacing" the first workpiece; defendant proposes using the word "displace" itself, while plaintiff proposes "pick." For the reasons set forth above, the Court will construe the term "displace" to mean "move from one location to another."

Second, the parties disagree whether to define "actual intermediate location." Plaintiff does not provide a definition, while defendant defines the term as "the exact same location that first workpiece was displaced to in the first place step." Defendant appears to rely on plaintiff's statement, made during the IPR, that the first workpiece "does not move" between the time that it is "placed" at the actual intermediate location and the time it is "picked" from the actual intermediate location. (Defendant's Opening *Markman* Brief, Docket No. 143 at 19). While it may be true that the first workpiece does not move during that time, the Court sees no reason to use the term "exact same" to emphasize that fact, particularly where the phrase would likely imply the same thing without the inclusion of those words. Under the circumstances, the term "actual intermediate location" will be given its plain and ordinary meaning.

In addition, adding the words "was displaced to" would be unnecessarily confusing. As set forth above, the specification describes the first workpiece as being "placed on"—not

"displaced to"—"the actual attach location" during the "second place step." ('327 patent col. 8 ll. 37-39). Thus, the actual intermediate location, in light of the words of the claim and the description of the specification, is better understood as the location to which the first workpiece is moved, rather than "displaced to."

Accordingly, the term "displace said first workpiece from said actual intermediate location" will be construed to mean "to move the first workpiece from the actual intermediate location."

### M. **"Performing a First Place Step to Displace"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Performing a first place step to displace" | "Picking a first workpiece from its original location and moving and placing it on the actual intermediate location" | "Determining a path between the origination location and the target intermediate location, and moving physically" |

### N. **"Performing a Second Place Step to Displace"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "Performing a second place step to displace" | "Picking the first workpiece from its position at the actual intermediate location and moving it and placing it on the actual attach location" | "Calculating a path between the actual intermediate location and the actual attach location and correcting for the intermediate error deviation from the first place step, and moving physically" |

The Court has previously construed the terms "displace" and "place" (when used, as here, as an adjective to modify the word "step"). The only remaining term is "performing."

The parties describe the act of "performing a first place step to displace" differently. Defendant uses the phrases "determining a path" and "moving physically," while plaintiff uses "picking." None of those phrases, however, are found in the relevant claims or portions of the specification, and thus will not be included in the construction.

The phrase "performing . . . a step" is readily understandable, and needs no further construction. That term may be construed according to its plain and ordinary meaning.

Accordingly, the terms "performing a first place step to displace" and "performing a second place step to displace," will be given their plain and ordinary meaning as to the term "performing," and will otherwise be construed in accordance with the remainder of this opinion.

**IV.**   **Conclusion**

For the foregoing reasons, the disputed claim terms are construed as follows:

1.   "first workpiece" will be construed to mean "a component that is to be placed onto a second workpiece."

2.   "second workpiece" will be construed to mean "a second component upon which the first workpiece is placed."

3.   "origination location" will be construed to mean "the location of the first workpiece at the beginning of the procedure."

4.   "target intermediate location" will be given its plain and ordinary meaning.

5.   "target attach location" will be given its plain and ordinary meaning.

6.   "actual attach location" will be construed to mean "the location on the second workpiece where the first workpiece is actually attached."

7.   "intermediate error deviation" will be construed to mean "the difference between the target intermediate location and the actual intermediate location."

8.   "attach error deviation" will be construed to mean "the difference between the target attach location and the actual attach location."

9.   "displace" will be construed to mean "move from one location to another."

10.   "place" will be given its plain and ordinary meaning.

11.     "pick" will be construed to mean "using a pickup tool to engage a workpiece."

12.     "displace said first workpiece from said actual intermediate location" will be construed to mean "to move the first workpiece from the actual intermediate location."

13.     "performing a first place step to displace," will be given its plain and ordinary meaning as to the term "performing," and the terms "place" and "displace" will be construed as stated above.

14.     "performing a second place step to displace," will be given its plain and ordinary meaning as to the term "performing," and the terms "place" and "displace" will be construed as stated above.

**15.     So Ordered.**


                                            /s/ F. Dennis Saylor IV
                                            F. Dennis Saylor IV
Dated:  May 16, 2019                        United States District Judge